## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ARTEM V. GELIS and BHAWAR PATEL, individually and on behalf of all others similarly situated,<br><br>　　Plaintiffs,<br><br>v.<br><br>BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT AND BMW OF NORTH AMERICA, LLC.,<br><br>　　Defendants. | Civil Action No. 17-CV-7386<br><br>**CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND** |

Introduction

1. Plaintiff Artem V. Gelis (hereinafter referred to as "Gelis") and Bhawar Patel (hereinafter referred to as "Patel") (jointly referred to as "proposed class representatives") through their counsel, on behalf of themselves and all other individuals and entities similarly situated as more fully described *infra*, initiate this proposed class action involving the following vehicles: (i) 2012 through and including 2015 model year BMW motor vehicles equipped with the N20 and N26 direct injection turbocharged engine (hereinafter collectively "class vehicles" or "class vehicle").

2. Class vehicles are equipped with four cylinder multi-valve in-line engines including but not limited to engine codes N20 and N26 (hereinafter "class engines" or "class engine").[1] The named proposed class representatives and members of the proposed class request injunctive relief, monetary damages, including multiple damages where applicable, court costs and attorney fees against each of the respective BMW entities based upon their breach of express warranty, breach of implied warranty,

---

[1] Class vehicles include but are not limited to the E84, E89, F10, F25 and F30 platforms sold and/or leased in the United States.

misrepresentation, unfair and deceptive business practices and unjust enrichment under the laws of New Jersey and the Magnuson-Moss Warranty Act and/or alternatively, as a nationwide class as further defined below.

3. Class engines are predisposed to premature primary and secondary chain assembly failures.[2] The chain assemblies are comprised of internal engine components. The primary chain (timing chain) assembly connects and synchronizes the engine's camshafts and crankshaft, which in turn controls the opening and closing of the valves in the engine's combustion chambers. The primary chain assembly ensures the engine operation occurs in the precise, synchronized manner necessary for the engine to properly function. A primary chain assembly partial or complete failure allows the chain to skip teeth on the chain sprockets. This occurrence causes the camshafts and crankshaft to fall out of synchronization and lose power or cause the engine's pistons and valves to violently collide into one another.

4. Depending on the degree of camshaft and crankshaft misalignment, the engine will operate poorly resulting in stalling and a limited ability to accelerate or maintain vehicle speed. Primary chain assembly failures can also cause sudden and catastrophic engine self-destruction as the valves impact the cylinder pistons where the chain skips multiple teeth of the sprockets in one occurrence or the chain breaks.

5. The primary chain plastic guide assemblies in class engines are defective and prematurely fail. The primary chain plastic guide assemblies become brittle and break apart because the guide assemblies are made of defective polycarbonate composition and other materials. Pieces of broken off plastic from the chain guide become lodged in the crankshaft drive sprockets causing chain breakage

---

[2] The primary chain assembly is comprised *inter alia* of camshaft and crankshaft sprockets, primary (timing) chain, hydraulic chain tensioner, tensioning rails and chain rails. The primary chain assembly is depicted in Figure 1, *infra.* The secondary chain assembly consists of the crankshaft and counterbalance shaft sprockets, oil pump drive chain, chain tensioner and integrated guide and tensioner rails. The secondary chain assembly is depicted in Figure 3, *infra.*

or chain skip sufficient to cause severe engine damage or complete engine destruction. These scenarios pose a serious safety issue while the vehicle is being operated since there is loss of engine power without warning, loss of power-assisted steering and reduced braking caused by lack of engine vacuum. In class vehicles equipped with manual transmissions, the drive wheels will lock and cause loss of directional stability and steering. In other instances, the engine may fail to start, leaving the driver and passenger stranded mid-journey.

6. The secondary chain (counterbalance shaft and oil pump drive chain) in class engines connects the oil pump and balance shaft assemblies to the crankshaft. The secondary chain assembly is also defective and prematurely fails. Secondary chain failure is caused by materials and design that are required to be high-wear resistant but instead are made of insufficient materials which fail to prevent high resistance wear, resulting in premature chain elongation, chain sprocket damage and chain slippage. This secondary chain was initially redesigned in approximately late 2014 and now incorporates a new solid center link plate. The secondary chain link plate configurations are depicted in Figure 4, *infra*. The secondary chain has been redesigned twice and has been assigned part numbers 11417605366, 11417602646 and 11418651102.

7. Class vehicles are defective with respect to the primary and secondary chain assemblies that subjects class engines to premature catastrophic engine failure. Class vehicles are further defective since the vehicles were accompanied by an owner's manual and Service and Warranty Information pamphlet that did not incorporate primary and secondary chain assembly inspections, maintenance and/or service intervals that were in fact necessary given the assemblies' propensity for premature failure.[3]

---

[3] A substantial contributing cause of premature engine chain assembly failures are 15,000 mile / 24 month Condition Based Service engine oil change intervals. For, 2014+ models, the new basic engine oil change interval is 10,000 miles / 12 months.

8. The primary and secondary chain assemblies are reasonably expected by Bayerische Motoren Werke Aktiengesellschaft (hereinafter "BMW AG") and BMW of North America, LLC (hereinafter "BMW LLC") (hereinafter collectively referred to as "defendants"), proposed class representatives and proposed class members to last the serviceable life of the vehicle that is in excess of 150,000 miles.[4]  The primary and secondary chain assemblies in class vehicles often fail at less than 50% of their reasonably expected useful life.  Patel's class vehicle experienced a primary chain assembly failure at approximately 71,000 miles.

9. Moreover, after experiencing a failure of the chain assemblies, some class engines are not repairable and require complete engine replacement.  Class engine failures cost class vehicle owners between $4,500.00 (to replace chain assemblies where there is no engine damage) and $22,000.00 (for a new replacement engine).  Individuals who own or have owned class vehicles also sustained diminution of the resale value of their class vehicles since knowledge of problems with class engines became public information.

**Jurisdictional and Venue Statement**

10. Federal jurisdiction exists by virtue of the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d), 1453 and 1711–1715 since there are in excess of 50,000 class members and the

---

[4] Service and Warranty Information materials for class vehicles have maintenance schedules that extend to 150,000 miles.  There is no scheduled maintenance or replacement recommended for class engine primary or secondary chains during the entirety of this mileage or time period.  Service and Warranty Information materials for class vehicles recite the following with respect to vehicle maintenance:

The BMW Maintenance Program is a benefit designed to help reduce the cost of ownership.  This program has been devised with the following objectives: to maximize vehicle safety, reliability, and resale value by minimizing breakdowns resulting from wear, and minimizing cost and inconvenience by computing maintenance intervals based upon the specific manner in which each individual vehicle is driven.

4

named proposed class representatives and proposed class members' aggregate damages exceed $5,000,000.00, exclusive of interest and costs. Minimal diversity exists between the parties with residency in different states. The jurisdictional requirements of the state Magnuson–Moss Act claims alleged herein as set out in 15 U.S.C. § 2310(d)(1)(A) are satisfied by CAFA diversity jurisdiction with respect to such state law claims.

11. The defendants are persons under this jurisdiction's long-arm statute. In the United States, BMW LLC acts as the alter ego and/or agent of BMW AG as well as the warrantor with respect to the class vehicles. *In personam* jurisdiction exists over the defendants under this jurisdiction's so-called "long arm statute." The defendants directly and through their agents regularly transact business and otherwise derive substantial revenue in this jurisdiction and throughout the entire United States. The defendants also conduct continuous, purposeful and pervasive economic activities in this jurisdiction and throughout the United States. The defendants intentionally and purposefully placed their vehicles and/or components in the stream of commerce in this jurisdiction and throughout the United States. Subjecting the defendants to *in personam* jurisdiction in this jurisdiction does not violate the defendants' due process rights and comports with requirements of fair play and substantial justice.

12. Venue is conferred by 28 U.S.C. § 1391 as the defendants regularly and purposefully conducted business in this judicial district and a substantial part of the events giving rise to the claim occurred in this judicial district.

**The Parties**

13(a). Plaintiff Patel is an adult individual who resides in Sparta, New Jersey. In July 2013, Patel purchased a used BMW 2013 X3 equipped with a class engine engine that was still under the original manufacturer's warranty from an authorized New Jersey BMW dealer. Patel's class vehicle experienced primary chain assembly failure in November 2016. At the time of the failure, the vehicle had approximately 71,000 miles. Patel incurred considerable expense (approximately $8,000.00)

5

replacing his class vehicle's engine with a used engine after the primary chain assembly prematurely failed and destroyed the original engine.

13(b). Plaintiff Gelis is an adult individual who resides in Naperville, Illinois.  In July 2013, Gelis purchased a new BMW 2013 328i equipped with a class engine engine that was accompanied by the original manufacturer's warranty from an authorized Illinois BMW dealer.  Gelis' class vehicle experienced primary chain assembly failure in August 2017.  At the time of the failure, the vehicle had approximately 65,500 miles.   Gelis will incur considerable expense (more than an estimated $8,000.00)[5] replacing his class vehicle's engine with a used engine after the primary chain assembly prematurely failed and destroyed the original engine.

14. Defendant BMW AG is a duly organized German corporation with a principal place of business in the city of Munich in the province of Bavaria, Germany.  BMW AG designed, manufactured and tested the class engine, including but not limited to the primary and secondary chain assemblies incorporated in class vehicles including but not limited to Patel's vehicle.  BMW AG drafted and published the owner's manual and Service and Warranty Information materials that accompanied class vehicles and/or were published on the Internet.  BMW AG is the parent company of BMW LLC.

15. Defendant BMW LLC is a duly organized Delaware corporation with a principal place of business located at 300 Chestnut Ridge Road in Woodcliff Lake, New Jersey.  BMW LLC manufactures, imports, distributes and/or sells BMW motor vehicles including all class vehicles and also acts as the authorized representative of BMW AG in the United States.  BMW LLC operates its national marketing, warranty, consumer relations and engineering offices from its New Jersey facility.

---

[5] Gelis' class vehicle's engine is currently being replaced and the final costs are not currently known.

BMW LLC also controls all other aspects of its United States activities from New Jersey including class vehicle importation.

16. BMW LLC sells and distributes vehicles manufactured by both BMW AG and BMW LLC throughout the United States via a network of over three hundred independent authorized dealerships. BMW LLC drafted and published the owner's manual and Service and Warranty Information materials that accompanied class vehicles and/or were published on the Internet.  BMW LLC acted, and continues to act, as the warrantor of vehicles constructed by both defendants sold in the United States.

17. At all relevant times, BMW LLC acted as an authorized agent, representative, servant, employee and/or alter ego of BMW AG performing activities concerning but not limited to advertising, marketing, warranties, warranty repairs, dissemination of technical information and monitoring the performance of BMW vehicles in the United States, including substantial activities that occurred within this jurisdiction.  There is sufficient overlapping and intertwining of the activities of BMW AG and BMW LLC in the United States that the principles of corporate separateness should not be applied.

18. New Jersey has the most significant relationship to the conduct that gave rise to this litigation since BMW LLC's wrongful activities were orchestrated at its New Jersey headquarters. New Jersey law should govern all substantive aspects of this litigation.  That conduct includes concealing defects described in this complaint and other activities to deny warranty coverage to defective engine components that should have been replaced under the new vehicle warranty without cost to the class vehicle owner as described in this complaint.

**<u>Class Action Allegations</u>**

19. The proposed class representatives brings this proposed action pursuant to Fed. R. Civ. P. 23(b)(1), 23(b)(2) and 23(b)(3) on behalf of themselves and all members of the proposed Class and subclasses (or any other class authorized by the Court) defined as follows:

**Nationwide Class**: All owners and former owners, lessees and former lessees of class vehicles who purchased their vehicles in the United States and who sustained monetary loss and/or diminution of class vehicle value resulting from the defendants' conduct as described in this complaint (hereinafter "proposed class members"). Excluded from the proposed class are the defendants together with their officers, directors, employees, assigns, and successors, the Court, Court staff, the defendants' counsel and all respective immediate family members of the excluded persons and entities described above. Also excluded from the proposed class are any and all claims involving personal injury.

**New Jersey Class:** All owners and former owners, lessees and former lessees of class vehicles who purchased their vehicles in the United States and who sustained monetary loss and/or diminution of class vehicle value resulting from the defendants' conduct as described in this complaint (hereinafter "proposed New Jersey class members"). Excluded from the proposed class are the defendants together with their officers, directors, employees, assigns, and successors, the Court, Court staff, defendants' counsel and all respective immediate family members of the excluded entities described above. Also excluded from the proposed class are any and all claims involving personal injury.

**Illinois Class:** All owners and former owners, lessees and former lessees of class vehicles who purchased their vehicles in the United States and who sustained monetary loss and/or diminution of class vehicle value resulting from the defendants' conduct as described in this complaint (hereinafter "proposed Illinois class members"). Excluded from the proposed class are the defendants together with their officers, directors, employees, assigns, and successors, the Court, Court staff, defendants' counsel and all respective immediate family members of the excluded entities described above. Also excluded from the proposed class are any and all claims involving personal injury.

## Numerosity of the Class: Fed. R. Civ. P. 23(a)(1).

20. The proposed class is so numerous that individual joinder of all potential members is impracticable under Fed. R. Civ. P. 19 or 20. It is estimated there are in excess of approximately 100,000 class vehicles imported into or constructed in the United States. Although the number, location and identity of all proposed class members can not be presently ascertained, this information is obtainable through discovery from the defendants.

## Existence of Common Questions of Law and Fact: Fed. R. Civ. P. 23(a)(2) and 23(b)(3).

21. Common questions of law and fact exist as to all members of the proposed class and predominate any and all issues of law and fact affecting individual members of the proposed class. These issues include but are not limited to:

(a) Whether class engines were defectively designed or manufactured, including workmanship and materials, so as to subject the engine to premature failure of the primary and secondary chain assemblies;

(b) Whether class engines sustained damage directly or indirectly by premature failure of the primary and secondary chain assemblies;

(c) Whether class vehicles were sold with an owner's manual and/or Service and Warranty Information materials that incorporated incorrect inspection and service intervals for the primary and secondary chain assemblies;

(d) Whether the defendants breached their express warranties (including but not limited to the powertrain-limited warranty) in that class vehicles were defective with respect to engine design and manufacture, including workmanship and materials;

(e) Whether the defendants breached their implied warranties in that class vehicles were defective with respect to engine design and manufacture, including workmanship and materials;

(f) Whether the defendants intentionally or negligently misrepresented material facts concerning the characteristics of class engines;

(g) Whether the defendants committed unfair and deceptive business act practices by failing to inform owners of class vehicles prior to purchase and/or during the post-sale express warranty period that the primary and secondary chain assemblies were defective and would fail shortly after the warranty period expired and cause damage to the engine, and that this defect posed a significant safety hazard;

(h) Whether the defendants were unjustly enriched by their warranty breaches and deceptive and/or unfair conduct described in this complaint;

(j) Whether proposed class members are entitled to monetary damages and injunctive relief pursuant to Rule 23(b)(2);

(k) Whether the Court should establish a constructive trust funded by the benefits conferred upon the defendants by their wrongful and unlawful conduct; and,

(l) Whether proposed class members are able to economically afford individual litigation against the defendants.

**Typicality of Claims or Defenses of a Definable Class: Fed. R. Civ. P. 23(a)(3).**

22. The proposed class representativesø claims and defenses are typical of the claims and defenses of proposed class members.  Class claims arise out of ownership or lease of class vehicles as defined in ¶ 1.  There are no defenses to plaintifføs claims on the part of defendants that are unique or different from the proposed lass.

**Adequate Representation: Fed. R. Civ. P. 23(a)(4).**

23. The proposed class representatives currently owns their class vehicle and has no conflicting interests with any other proposed class member.  The proposed class representatives will fairly and adequately protect the interests of the proposed subclasses.  The proposed class representativess claims and the proposed class membersø claims are so interrelated that the interests of the proposed class members will be fairly and adequately protected in their absence.  The proposed class counsel have, in aggregate, over 60 years of experience concentrating in complex automotive products liability, and have been appointed class counsel in other proceedings.

**Superiority of a Class Action: Fed. R. Civ. P. 23(b)(3).**

24. Maintenance of a class action in one court is the most economical procedural device to litigate the class vehicle and class engine claims for class vehicle owners and the defendants. Prosecution of separate actions by individual members of the class could create risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class as recognized by Fed. R. Civ. P. 23(b)(1)(A).

10

25. Prosecution of separate actions by individual members of the class could create risk of adjudications with respect to individual members of the class which would, as a practical matter, be dispositive of the interests of the other members of the class who are not parties to the adjudications or substantially impair or impede their ability to protect their interests as recognized by Fed. R. Civ. P. 23(b)(1)(B).

26. There is a substantial likelihood that the defendants will oppose this class action and will further act or refuse to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole impractical as recognized by Fed. R. Civ. P. 23(b)(2).

27. Questions of law and fact common to members of the class predominate over any questions affecting any individual members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy as recognized by Fed. R. Civ. P. 23(b)(3).

**Class Engine Timing Chain System Defect**

28. If designed and manufactured correctly, engine primary and secondary assemblies should last a minimum of 150,000 miles in a modern automobile such as the class vehicles.  This is demonstrated by the defendants' Service and Warranty Information materials  accompanying class vehicles, other engines manufactured by the defendants incorporating a primary and secondary chain assemblies and performance of comparable competitor vehicles.

29. Class engines use hydraulic chain tensioners (one for primary and another for the secondary chain) incorporating an internal coil spring and oil passages to regulate tension on the chain-tensioning rail that applies tension to the respective chains.  This tension keeps the chain from jumping the teeth on the sprockets that are attached to the crankshaft, camshafts and counterbalance sprocket and maintains synchronization between rotating engine components including the cylinder valves and pistons.  Without proper chain tension and synchronization, the engine will run very poorly (if at all)

11

and/or, if sufficient chain skip and mis-synchronization occurs, its failure to function properly will cause cylinder valves and pistons to collide, resulting in severe internal damage to the engine.

30. BMW has been concealing the problem since 2013 when it began to redesign the chain tensioner to alleviate the problem but without revealing to class members the defect or its knowledge thereof. This effort culminated in or about February 2017, when BMW released Technical Service Bulletin to address defects in class engine chain assemblies. Technical Service Bulletin SI B11 03 17 describes the symptoms associated with the defective engine chain assemblies as "N20 AND N26 ENGINE; HIGH PITCHED WHINING NOISE FROM LOWER ENGINE AREA" caused by "[w]ear on the engine oil pump chain drive sprockets." Technical Service Bulletin SI B11 03 17 further states that the "CORRECTION" is to "[r]eplace the engine oil pump drive chain module[6], timing chain, timing chain tensioner, slide rail, tensioning rail and guide rail." *Id*. *See* Technical Service Bulletin SI B11 03 17 attached Exhibit B.

31. The date of this service bulletin, comments on various web sites and the lead time necessary to investigate class engine chain assembly failures, redesign and manufacture the updated components demonstrates that the defendants were again aware of defects in the redesigned primary and secondary chain assemblies in late 2012 or early 2013 (as discussed *supra*, assemblies had been previously redesigned earlier).

32. The defendants purposefully ignored the primary and secondary chain assembly defects for years in order to avoid substantial costs associated with remedying these defects under warranty. Moreover, the defendants are attempting to conceal primary chain defects by changing out the primary chain assembly components as part of remedying the secondary chain assembly noise issue.

---

[6] As discussed *supra*, the engine (secondary) "oil pump drive chain module" consists of the crankshaft and counterbalance shaft sprockets, oil pump drive chain, chain tensioner and integrated guide and tensioner rails. The secondary chain assembly is depicted in Figure 3, *infra*.



N20 engine, camshaft drive

| Index | Explanation |
| --- | --- |
| 1 | Exhaust VANOS |
| 2 | Intake VANOS |
| 3 | Chain tensioner |
| 4 | Primary chain |
| 5 | Tensioning rail |
| 6 | Sprocket, driven by crankshaft |
| 7 | Secondary chain (tooth-type chain) |
| 8 | Chain tensioner |
| 9 | Sprocket for counterbalance shaft and oil pump drive |

**FIGURE 1: CLASS ENGINE TIMING CHAIN ASSEMBLIES[7]**

33. In fact, the defendants redesigned the primary chain, primary chain tensioner and primary chain guide/rails incorporated in class engines multiple times in an effort to resolve the primary chain assembly defects that cause catastrophic engine failure.  *See* Figure 2, *infra* depicting the class engine original primary chain tensioner and revised design.  The revised design has increased piston travel,

---

[7] © 2010 BMW AG

longer housing and a stronger internal spring to better regulate primary chain tension and decrease the incidence of primary chain assembly failure.  The primary chain tensioners have been assigned part numbers 11317567680 (original tensioner design) and 11318685091 (revised tensioner design).



**FIGURE 2: CLASS ENGINE TIMING CHAIN TENSIONERS[8]**

---

[8]   The original class engine secondary chain tensioner is depicted at the top of the photograph, the revised chain tensioner is underneath.



N20 engine, counterbalance shaft and oil pump drive

| Index | Explanation |
|-------|-------------|
| 1 | Crankshaft sprocket |
| 2 | Chain |
| 3 | Chain tensioner |
| 4 | Counterbalance shaft sprocket |

**FIGURE 3: CLASS ENGINE OIL PUMP CHAIN DRIVE ASSEMBLY**

34. The defendants also redesigned the secondary chain using a different link plate configuration. The secondary chain has been assigned part numbers 11417602646 (original secondary

chain design) and 11418651102 (revised secondary chain design).  The secondary chain designs are depicted in Figure 4, *infra.*



**FIGURE 4: ORIGINAL AND REVISED CLASS ENGINE OIL PUMP CHAIN DRIVE**[9]

35. Another cause of primary and secondary chain assembly failures is chain stretch.  When this condition occurs, slack introduced into the primary chain assembly causes misalignment of the camshafts and crankshaft synchronization.  As the chain stretch condition worsens and the capacity of

---

[9] The original class engine secondary chain is depicted at the top of the photograph, the revised chain is underneath.

the hydraulic chain tensioners is exceeded, chain slippage on the camshaft/crankshaft sprocket teeth will eventual allow sufficient camshaft and crankshaft synchronization misalignment where the engine pistons collide with the cylinder valves causing catastrophic engine damage.   Slippage of the secondary chain will cause excessive vibration and eventual chain failure as the crankshaft and counter balance shafts are no longer synchronized.

36. The chain assemblies for the class engines have been redesigned (and in some instances assigned different part numbers) a minimum of five times.  Some of these changes date back to 2013 and were used for less than one model year.

37. Prior to manufacturing and then distributing a new part, defendants perform substantial field inspections and quality review of vehicles in service to determine the root cause and diagnosis of a problem.  After these tasks are completed, the defendants prepare draft and final specifications prior to setting the revised part out to bid.  All of this takes at least twelve months of lead-time under normal circumstances.

38. The defendants, therefore, knew or should have known at least in 2012 or early 2013 that the chain assemblies and related components in class engines were defective and would prematurely fail as evidenced by the fact that the tensioners for certain model BMW engines had been assigned a new part number and that tensioner was used on predecessor engines.

39. Complaints online, which are carefully monitored by Defendants, demonstrate failed primary and secondary chain assemblies in class engines.  Recently, independent BMW vehicle repair shops also have posted a description of the chain assembly failures occurring with class engines on their       websites       as       part       of       their       marketing.       *See* http://f30.bimmerpost.com/forums/showthread.php?t=1089085 (Last reviewed September 6, 2017).

**Complaints to the National Highway Traffic Safety Administration**

40. The National Highway Traffic Safety Administration ("NHTSA") Office of Defects Investigation ("ODI") maintains a database of complaints filed by consumers concerning defects in their motor vehicles and vehicle equipment. The NHTSA-ODI website allows consumers to "identify and report problems you might be having with your vehicle, tires, equipment or car seats." *See* https://www-odi.nhtsa.dot.gov/ivoq/ (last accessed March 18, 2017) ("If you think you have a problem, we want you to tell us about it."). Set forth below are complaints submitted by owners of class vehicles and reported to the NHTSA demonstrating that the N20/N26 chain defect was known to the defendants and constitutes an unreasonable safety hazard:[10]

| | | |
|---|---|---|
| **Date Complaint Filed:** 07/14/2017 | | **Date of Incident:** 03/31/2017 |
| **Component(s):** ENGINE , UNKNOWN OR OTHER | | **NHTSA ID Number:** 11005332 |
| **Consumer Location:** MELVILLE, NY | | |

**All Products Associated with this Complaint** ▲

| **Vehicle Make** | **Model** | **Model Year(s)** |
|---|---|---|
| BMW | X3 | 2013 |

Details ▲                                        0 Available Documents

| **Crash:** No | **Fire:** No | **Number of Injuries:** 0 | **Number of Deaths:** 0 |
|---|---|---|---|

**Manufacturer:** BMW of North America, LLC
**Vehicle Identification No. (VIN):** 5UXWX9C50D0...
**SUMMARY:**
EARLIER THIS YEAR WHILE DRIVING MY 2013 BMW X3 ON THE HIGHWAY IT BROKE DOWN WITH LITTLE WARNING. FORTUNATELY I WAS ABLE TO GET TO AN EXIT RAMP BEFORE MY CAR COMPLETELY FAILED. AFTER HAVING IT FLAT BEDDED TO A MECHANIC WHO HAD TO PUSH THE VEHICLE INTO THE SHOP THEY VERIFIED THAT THE VEHICLE WOULD CRANK OVER AND NOT START. IT WAS RELATIVELY CLEAR FROM THE SOUND THE ENGINE WAS MAKING DURING THE STARTER ENGAGEMENT THAT THE CAMSHAFT TIMING WAS OFF. THE VALVE COVER WAS REMOVED AND THE MECHANIC VERIFIED THAT THE TIMING WAS INDEED OFF. THE TIMING CHAIN HAD JUMPED TIME ON BOTH THE INTAKE AND EXHAUST CAMSHAFTS. THE TIMING WAS OFF DUE TO EXCESSIVE SLACK IN THE TIMING CHAIN DUE TO A FAILED CHAIN TENSIONER. THIS SHOULD NOT HAPPEN ON A 2013 BMW WITH MAINLY HIGHWAY MILES. I WAS TOLD I NEED A NEW ENGINE THAT WILL COST UPWARDS OF $15,000 OR BUY A SLIGHTLY USED ONE FOR APPROXIMATELY $9,000. I'VE REACHED OUT TOT HE

---

[10] NHTSA-ODI does not share complainants' personal information with the general public. A complaint is only added to a public NHTSA database only after it removes all information from complaint fields that personally identify a complainant. NHTSA-ODI complaints are made by individuals who must identify themselves, enter detailed contact information and vehicle information (including an accurate VIN) before the complaints are reviewed and analyzed by NHTSA. There are penalties for submitting false statements.

DEALER AND BMW NA WITH NO RELIEF. SIMILAR ISSUES HAVE BEEN IDENTIFIED IN THE X5 AND OTHER BMW CARS WHICH WERE RECALLED BUT FOR SOME REASON NO RECALL WAS SENT OUT ON THE N20 ENGINE FOR THE X3. FROM A QUICK INTERNET SEARCH THERE ARE MANY X3 OWNERS THAT HAVE THE SAME OR SIMILAR PROBLEMS. SOMETHING NEEDS TO BE DONE TO GET RELIEF FOR THESE OWNERS. UNFORTUNATELY THIS ONCE PROUD VEHICLE MAKER THAT NO LONGER BACKS THE LONGEVITY OF THE LUXURY CAR THEY BUILD.

*            *            *

**Date Complaint Filed:** 07/11/2017                              **Date of Incident:** 06/09/2017
**Component(s):** ENGINE                                          **NHTSA ID Number:** 11003073
**Consumer Location:** RESTON, VA

**All Products Associated with this Complaint ▲**

| Vehicle Make | Model | Model Year(s) |
|---|---|---|
| BMW | 528XI | 2012 |

Details ▲                                                        0 Available Documents

**Crash:** No   **Fire:** No            **Number of Injuries:** 0   **Number of Deaths:** 0
**Manufacturer:** BMW of North America, LLC
**Vehicle Identification No. (VIN):** WBAXH5C57CD...
**SUMMARY:**
TIMING CHAIN IS LOOSE PER THE DEALER. THE CAR ONLY HAS 59,000 MILES. THE CAR HAS NOT STOPPED BUT IF THE CHAIN BREAKS IT WILL STOP WHEREVER IT HAPPENS. I COULD BE DRIVING ON A BUSY INTERSTATE AND THE CAR WILL STOP. THIS IS DEFINITELY A SAFETY ISSUE.

*            *            *

**Date Complaint Filed:** 06/27/2017                              **Date of Incident:** 06/26/2017
**Component(s):** ENGINE                                          **NHTSA ID Number:** 11001808
**Consumer Location:** OVERLAND PARK, KS

**All Products Associated with this Complaint ▲**

| Vehicle Make | Model | Model Year(s) |
|---|---|---|
| BMW | X3 | 2013 |

Details ▲                                                        0 Available Documents

**Crash:** No            **Fire:** No     **Number of Injuries:** 0     **Number of Deaths:** 0
**Manufacturer:** BMW of North America, LLC
**Vehicle Identification No. (VIN):** 5UXWX9C5XD0...
**SUMMARY:**
I HAVE A 2013 X3 28I THAT WAS PURCHASED FAIRLY NEW WITH 15K MILES ON IT AND HAS HAD ALL BMW RECOMMENDED MAINTENANCE AT A BMW DEALER. I HAVE EXACTLY 50K MILES ON THE CAR. A COUPLE OF DAYS AGO, WITH NO WARNING THE TIMING CHAIN BROKE AND BLEW THE ENGINE. I HAD JUST TAKEN IT TO THE DEALERSHIP A COUPLE OF WEEKS PRIOR FOR MAINTENANCE AND THEY SAID EVERYTHING LOOKED GREAT. THE DEALER FIRST TOLD ME IT WAS GOING TO COST OVER 20K TO REPLACE THE ENGINE. BMW GOT INVOLVED AND NOW I'M TOLD IT WILL COST JUST OVER 15K PLUS TAXES. I STARTED CHECKING ONLINE AND NOTICED THAT BMW HAS HAD A LOT OF PROBLEMS WITH THE TIMING CHAIN, HOWEVER THEY DON'T LIST THE X3 AS ONE OF THE CARS WITH THE PROBLEM. AT 4 YEARS OLD AND 50K MILES, I WOULD THINK THE TIMING CHAIN SHOULDN'T BREAK, AND DEFINITELY SHOULDN'T COST 1/3 OF A NEW CAR TO REPAIR.

*            *            *

**Date Complaint Filed:** 05/23/2017                                                   **Date of Incident:** 05/19/2017
**Component(s):** ENGINE                                                               **NHTSA ID Number:** 10991176
**Consumer Location:** FAYETTEVILLE, GA
**All Products Associated with this Complaint** ▲

| Vehicle Make | Model | Model Year(s) |
|---|---|---|
| BMW | 328I | 2013 |

0 Available Documents

**Details** ▲                                                                                                    ❓

|  | **Crash:** No | **Fire:** No | **Number of Injuries:** 0 | **Number of Deaths:** 0 |
|---|---|---|---|---|

**Manufacturer:** BMW of North America, LLC
**Vehicle Identification No. (VIN):** WBA3B3C53DF...
**SUMMARY:**
TIMING CHAIN IS MAKING A WHINE AND A RATTLE SOUND WHEN ENGINE IS RUNNING. THE N20
ENGINE (TWIN TURBO 4 CYLINDER) IN THIS CAR ANY MANY OTHER BMW VEHICLES TIMING CHAINS
ARE KNOWN TO STRETCH AND BREAK ALONG WITH THE ORIGINAL BROWN/DARK ORANGE COLOR
PLASTIC TIMING CHAIN GUARD RAIL. THE TIMING CHAIN GUARD RAIL WAS MADE OUT OF A
DEFECTIVE PLASTIC UNTIL AROUND 1/1/15 WHEN BMW REALIZED THERE WERE OWNERS HAVING
CATASTROPHIC ENGINE FAILURE NOT IF THE CHAIN BREAKS, BUT WHEN. THE ONLY REPAIR IF THE
ENGINE FAILS IS TO REPLACE THE ENGINE AT A COST OF APPROX. $12K AND $8K IN LABOR
TOTALING ABOUT $20K WHICH EXCEEDS THE VALUE OF MY VEHICLE. VEHICLES WITH THIS ENGINE
MANUFACTURED AFTER 1/1/15 HAVE THE REDESIGNED MORE DURABLE WHITE PLASTIC TIMING
CHAIN GUARD RAIL ALLOWING THE ENGINE TO RUN SMOOTHER AND WITHOUT THE RISK OF
ENGINE CATASTROPHIC FAILURE. THERE IS A GRAVE SAFETY RISK FOR OWNERS WITH THIS
ENGINE WITH THE ORIGINAL PRE-2015 TIMING CHAIN & GUARD RAIL DESIGN BECAUSE IF YOU ARE
TRAVELING IN NORMAL TRAFFIC OR ATTEMPTING TO CROSS A TRAIN TRACK OR OTHER
DANGEROUS INTERSECTIONS, OCCUPANTS CAN BE KILLED AS A RESULT OF THE VEHICLE
STALLING. CONTACTED BMW NORTH AMERICA ON 5/19/17 REGARDING THE ISSUE AND HAD THE
VEHICLE INSPECTED BY MY LOCAL BMW DEALERSHIP WHO INDICATED THERE WAS NOTHING
WRONG. THE TOTAL COST TO REPLACE MY ORIGINAL TIMING CHAIN AND TIMING CHAIN GUARD
RAIL WITH THE RE-DESIGNED VERSION WOULD COST $4600 WITH PARTS & LABOR. BMW USA AND
THE DEALERSHIP REFUSED TO COVER THE COST AND DENIED THIS IMPORTANT SAFETY DEFECT. I
ALSO PROVIDED THEM A COPY OF A WEB LINK WITH A YOUTUBE VIDEO OF THE ISSUE NARRATED
BY AN INDEPENDENT BMW TECHNICIAN EXPLAINING THE DEFECT. SEE THE LINK BELOW WHICH
CONTAINS PHOTOS AND THE YOUTUBE VIDEO RELATED TO THIS ISSUE.
HTTPS://BMWTECHNICIAN.COM/2016/08/07/N20-TIMING-CHAIN-ISSUE/

*          *          *

**Date Complaint Filed:** 02/14/2017                                                   **Date of Incident:** 01/19/2017
**Component(s):** UNKNOWN OR OTHER                                                     **NHTSA ID Number:** 10954592
**Consumer Location:** HUNTINGTON BEACH, CA
**All Products Associated with this Complaint** ▲

| Vehicle Make | Model | Model Year(s) |
|---|---|---|
| BMW | X3 | 2013 |

0 Available Documents

**Details** ▲                                                                                                    ❓

| **Crash:** No | **Fire:** No | **Number of Injuries:** 0 | **Number of Deaths:** 0 |
|---|---|---|---|

**Manufacturer:** BMW of North America, LLC
**Vehicle Identification No. (VIN):** 5UXWX9C53D0...
**SUMMARY:**
MY CAR HAS APPROX 78000 MILES ON IT. I AM THE ORIGINAL OWNER. CAR HAS BEEN MAINTAINED
ROUTINELY AT BMW DEALERS AT ALL THE RECOMMENDED TIME MARKS BY THE MANUFACTURE.
RECENTLY, MY CAR STALLED WHILE I WAS DRIVING ON THE FREEWAY, AND HAD TO BE TOWED TO
THE BMW DEALERSHIP. AFTER 1 WEEK OF RUNNING DIAGNOSTIC TESTS, I WAS INFORMED THAT
THE TIMING CHAIN HAS BROKEN, AND PIECES FROM THE CHAIN FLEW INTO THE ENGINE AND
COMPLETELY RUINED IT.
*          *          *

**Date Complaint Filed:** 12/20/2016

**Date of Incident:** 12/10/2016

**Component(s):** ENGINE

**NHTSA ID Number:** 11003073

**Consumer Location:** KANSAS CITY, KS

**All Products Associated with this Complaint** ▲

| Vehicle Make | Model | Model Year(s) |
|---|---|---|
| BMW | X3 | 2013 |

0 Available Documents

**Crash:** No        **Fire:** No              **Number of Injuries:** 0 **Number of Deaths:** 0

**Manufacturer:** BMW of North America, LLC

**Vehicle Identification No. (VIN):** 5UXWX9C5XD0...

**SUMMARY:**

TIMING CHAIN MALFUNCTION/ENGINE FAILURE

*              *              *

**Date Complaint Filed:** 12/12/2016

**Date of Incident:** 11/24/2016

**Component(s):** ENGINE , POWER TRAIN

**NHTSA ID Number:** 10934863

**Consumer Location:** EL PASO, TX

**All Products Associated with this Complaint**

| Vehicle Make | Model | Model Year(s) |
|---|---|---|
| BMW | X3 | 2011 |

0 Available Documents

**Crash:** No        **Fire:** No              **Number of Injuries:** 0 **Number of Deaths:** 0

**Manufacturer:** BMW of North America, LLC

**Vehicle Identification No. (VIN):** Not Available

**SUMMARY:**

I TOOK MY CAR IN FOR AN OIL CHANGE AND WAS CALLED BACK BY THE AUTO PLACE AND WAS TOLD THAT, WHILE THEY WERE TEST DRIVING THE VEHICLE IT HAD A MAJOR ENGINE FALIURE, RESULTING IN THEM HAVING TO TOW THE CAR AND WAS TOLD THAT THE TIMING CHAIN HAD BROKEN AND THERE WAS MASSIVE DAMAGE INTERNALLY TO THE ENGINE, VALVES HAD BEEN BENT DUE TO FAILURE. I HAVE SPOKEN TO BMW BUT HAVE NOT GOTTEN ANY RELIEF. IT IS IMPORTANT TO MENTION THAT THIS CAR ONLY HAS 65,000 MILES ON IT. THIS FALIURE IS INSANE AND BMW IS NOT WILLING TO HONOR ANYTHING. *TR

*              *              *

**Date Complaint Filed:** 04/22/2016

**Date of Incident:** 04/14/2016

**Component(s):** ELECTRONIC STABILITY CONTROL , POWER TRAIN , UNKNOWN OR OTHER

**NHTSA ID Number:** 10861029

**Consumer Location:** ARLINGTON, VA

**All Products Associated with this Complaint**

| Vehicle Make | Model | Model Year(s) |
|---|---|---|
| BMW | 528I | 2012 |

0 Available Documents

**Crash:** No        **Fire:** No              **Number of Injuries:** 0 **Number of Deaths:** 0

**Manufacturer:** BMW of North America, LLC

**Vehicle Identification No. (VIN):** WBAXH5C58CC...

**SUMMARY:**

VEHICLE BOUGHT IN JULY 2014 WITH ~24K MILES; STILL UNDER FACTORY WARRANTY.

MAINTENANCE MAINTAINED. 9-12 MONTHS LATER, A "DRIVE TRAIN MALFUNCTION" LIGHT CAME ON. I HAD JUST LEFT THE DEALERSHIP SO I CALLED THEM AND THEY TOLD ME TO BRING IT BACK IMMEDIATELY; I DID. MANY TESTS LATER, WAS TOLD MY "MOTHERBOARD DIED" (DME UNIT); AFTER A MONTH IN THE SHOP...REPAIRED. NOW, 4/2016, LESS THAN 60K AND FRESH OUT OF WARRANTY...I WAS DRIVING HOME WITH MY SON ON THE INTERSTATE, ABOUT TO GET OFF OF MY EXIT AND ANOTHER "DRIVE TRAIN MALFUNCTION AND LOW ENGINE PRESSURE" LIGHT COMES ON AND THEN ALL OF A SUDDEN MY CAR STOPPED ON THE 4 LANE OFF-RAMP. AFTER WAITING FOR AN HOUR FOR THE TOW TRUCK TO ARRIVE AND TRYING TO PUT MY CAR INTO NEUTRAL AND ABOUT 30 MIN WITH THE TOW TRUCK DRIVER TRYING TO PUT THE CAR IN NEUTRAL, I CALLED THE BMW DEALERSHIP AND I FOUND OUT THAT BECAUSE MY CAR IS ALL ELECTRIC IT CANNOT BE PUT INTO NEUTRAL; A WEEK AT THE DEALERSHIP AND STILL THERE AS I TYPE6  DIAGNOSIS: TIMING CHAIN BROKE INTO THE ENGINE AND NOW THE CAR NEEDS A NEW ENGINE WHICH I WAS QUOTED TO BE $21,000. THE CAR IS ONLY 4 YEARS OLD!!!!! NEEDLESS TO SAY, IT WAS BY THE GRACE OF GOD THAT MY SON AND I WERE NOT INJURED OR KILLED WHEN THE ENGINE JUST SHUT OFF IN THE MIDDLE OF TRAFFIC. AND ON TOP OF THAT, IT IS ABSURD THAT THE CONSUMER CANNOT MANUALLY PUT THIS VEHICLE INTO NEUTRAL TO MOVE IT OUT OF HARM$ WAY IF IT$ POSSIBLE TO DO SO. THE ONLY WAY TO PUT THE CAR IN NEUTRAL WHEN INOPERABLE IS TO TAKE IT TO THE DEALERSHIP. UNSAT! AND FOR A CAR COMPANY THAT IS SUPPOSED TO HAVE A GREAT REPUTATION AND HIGH STANDARDS, IT'S ABSURD THAT A NEW ENGINE IS NEEDED FOR A CAR THAT IS BARELY 4 YEARS OLD. I HAVE SEEN THE SAME ISSUES WITH OTHER BMW OWNERS ALL OVER THE INTERNET. LOVE BMW AND HAVE OWNED 3 OF THEM AND IT$ UNFORTUNATE THAT THIS ONE WILL BE MY LAST BECAUSE I DO NOT FEEL SAFE IN THIS VEHICLE ANYMORE.

*          *          *

## Tolling of the Limitations Period

41.  The fraudulent conduct of the defendants tolls any applicable statutes of limitations since the fraudulent misrepresentations concerning the true cause of failures in class vehicles was an inherently unknowable fact given the technical nature of the class vehicle design and manufacturing defects, including materials and workmanship.

42.  Class vehicle owners do not possess the requisite technical skills in automotive engineering to discern the design, manufacture, materials and workmanship defects in their vehicles or the requisite technical skills to surmise the proper vehicle maintenance and maintenance intervals for class vehicles.

43.  The statutory and case law of New Jersey together with the doctrine of equitable tolling and/or the discovery rule, toll the applicable statutes of limitations for all class vehicles because of the defendantsø fraudulent conduct, including but not limited to concealment of class vehicle defects and omission of material facts.

44.  Some proposed class members relied on the defendantsø fraudulent misrepresentations concerning the cause of class engine failures and therefore delayed bringing suit against the defendants.  These misrepresentations relate to the fact that, in reality, class engines were failing due to

design, manufacture, materials and/or workmanship defects.  The defendants, however, fraudulently attributed the failings of class vehicle chain assemblies to other factors and/or exculpating conditions for which the defendants had no responsibility.

45. The defendants are estopped from asserting that statutes of limitations were running for the duration of time class members relied on the defendants' fraudulent representations.

46. The defendants are equitably estopped from asserting the statutes of limitations have run against the claims of class members.

**Further Allegations**

47. The defendants fraudulently, intentionally, negligently and/or recklessly concealed from proposed class representatives and proposed subclass members the defects in the class engines even though the defendants knew or should have known of design and manufacturing defects in class vehicles if the defendants had adequately tested class engines.

48. The defendants had actual knowledge that design, manufacturing, materials and/or workmanship defects were causing extensive irreversible premature performance degradation in class engine chain assemblies shortly after production of the class vehicles commenced.

49. Defendants engaged in extensive field research and quality investigations and analysis before redesigning the specifications for the defective part, rebidding the new part and manufacturing and distributing the new part.  In addition, defendants have and continue to be under a legal obligation pursuant to federal law to monitor defects that can cause a safety issue and report them within five (5) days of learning of them.  The defendants therefore assiduously monitor the NHTSA's ODI website and the complaints filed therein in order to comply with their reporting obligations under federal law.

50. The defendants failed to inform class vehicle owners prior to purchase or during the express warranty period that their engine primary and secondary chain assemblies was defective and would fail shortly after the express warranty period expired.  The defendants misrepresented by affirmative

conduct and/or by omission and/or by fraudulent concealment the existence of defects in the class engine.

51. The defendants also failed to inform class vehicle owners at the time of purchase that the primary and secondary chain assemblies in their class vehicles' engine had been inadequately tested prior to placing the car in production and the time of vehicle sale.

52. The defendants also failed to inform class vehicle owners that there had been several significant subsequent primary and secondary chain assembly modifications including design, materials and manufacturing improvements as described in this complaint that reduced and/or eliminated premature chain assembly failure while purchasers' vehicles were within the durational limitation of the express warranty period, including the powertrain limited warranty.[11]  Specifically covered by this powertrain limited warranty were "all internal [engine] parts" including the engine chain assemblies.  This warranty promised to repair or replace covered defective class engine components arising out of defects in materials and/or workmanship for a period of 4 years or 50,000 miles, whichever occurs first for non-commercial purchasers.

53. The defendants knew in 2012 or 2013 (the date the investigation into modifications to components in the class engines' chain assemblies commenced) that class engines were experiencing premature engine chain assembly failures.  Despite this knowledge, the defendants continued to sell class vehicles with chain assemblies that were defective.  This knowledge is imputed to BMW AG because BMW LLC was monitoring warranty claims and class vehicle performance in the United States, and reporting back to its parent companies located in Germany.

---

[11] Class vehicles were accompanied by a limited warranty "against defects in materials or workmanship" for "48 months or 50,000 miles, whichever occurs first" from "the date of first retail sale or the date the vehicle is first placed into service as a sales demonstrator, Aftersales Mobility Program (AMP) Vehicle or company vehicle, whichever is earlier."

54. The proposed class representatives and proposed class members had valid and binding warranties and contracts with the defendants and were reasonably expected by the defendants to use their respective class vehicles in the manner in which passenger motor vehicles were used.

56. The proposed class representatives and proposed class members complied with all warranty and contractual obligations including all warranty, warranty notice, maintenance and product use obligations for their respective class vehicles. The proposed class representatives and proposed class members operated their class vehicles under normal anticipated conditions in noncommercial environments.

57. The defendants have timely received the proposed class representatives' breach of warranties notice through authorized representatives and have suffered no resulting prejudice. Moreover, the proposed class representatives contacted BMW LLC directly and/or through an authorized dealership.

58. The proposed class representatives was informed by a representative of BMW LLC that BMW LLC would not provide assistance in repairing class engines because the vehicles were outside of the express warranty period.

59. The defendants refused to fully reimburse or compensate the proposed class representatives for vehicle repair expenses or provide a suitable substitute or replacement vehicles.  Although their vehicles' chain assembly failure occurred outside the unilateral express warranty period (which was not bargained for prior to purchase), the proposed class representatives' class vehicles exhibited unmistakable symptoms (known only by the defendants) of degradation and impending premature failure within the express warranty period.

60. Despite actual and constructive knowledge of class vehicle defects as described in this complaint, the defendants failed to cure class vehicle defects within the express warranty period and thereby breached the terms of the express warranty.

61. Through no fault of their own, the proposed class representatives and proposed class members did not possess sufficient technical expertise to recognize symptoms of impending chain assembly failure.  This information, however, was well known to the defendants, but not revealed.

62. The proposed class representatives relied upon material misrepresentations, fraudulent statements and/or material omissions of employees and agents of the defendants at the time of purchase, including but not limited to the useful and expected life of class vehicles and the recommended class vehicle maintenance program.

63. The defendants' misrepresentations and fraudulent statements were received by the respective proposed class representatives prior to and at the point of their class vehicle purchase. These representations were made by BMW dealers referencing publications concerning class vehicles including the owner's manual and the Service and Warranty Information.  The representations created a reasonable belief the useful life expectancy of class vehicles without a major engine failure was in excess of 150,000 miles.   These representations specifically related that the engine primary and secondary chain assemblies were non-maintenance engine lifetime components.

64. The defendants actively concealed the true reasonably expected duration of class vehicle components, including but not limited to the primary and secondary chain assemblies, from the proposed class representatives and all class vehicle purchasers.  The defendants intentionally failed to inform class vehicle purchasers that class vehicles incorporated a defective and/or improperly tested primary and secondary chain assemblies that would prematurely fail within the reasonably expected useful life of the vehicle.

65. The defendants intentionally failed to inform class vehicle purchasers that the primary and secondary chain assemblies incorporated in class vehicles results in higher operational costs than alternative conventional primary and secondary chain assemblies or other competitive technology

because the primary and secondary chain assemblies prematurely fails within the reasonably expected useful life of the vehicle.

66. The defendants actively and fraudulently concealed the existence of class vehicle design and manufacture defects (including defects covered under class vehicle warranties concerning materials and workmanship) and that the owner's manual accompanying class vehicles incorporated improper maintenance recommendations and maintenance intervals.

67. The proposed class representatives and class members did not learn their respective class vehicle was defectively designed and manufactured until after their chain assemblies failed.

68. The defendants' customer service telephone representatives made false and fraudulent representations to class members as to the cause and existence of chain assembly defects in class vehicles although the service representative received hundreds of consumer complaints that class vehicles prematurely failed. The defendants' employees falsely represented certain conditions for which the defendants were not responsible as the basis for the failures that were in fact caused by a defect in materials, manufacturing and design. They falsely stated that defendants were not responsible for the resulting class vehicle failures and/or denied the existence of known class vehicle defects. These excuses included use of improperly formulated or stale gasoline, incorrect engine oil, driving conditions, lack of proper maintenance and other convenient excuses.

69. Authorized BMW dealers did not have knowledge of and/or were counseled not to admit that any defects existed in class vehicles or that improper maintenance recommendations were incorporated in the owner's manual. BMW dealers (who also had a vested financial interest in concealing and suppressing the actual cause of class vehicle failures) improperly blamed vehicle failures on certain conditions for which the defendants would not be responsible and/or denied the existence of defects in the primary and secondary chain assemblies.

27

70. The defendants had actual knowledge, constructive knowledge and/or should have known upon proper inquiry and testing that class vehicles were defective with respect to their primary and secondary chain assemblies, suffered from extensive irreversible premature performance degradation during the warranty period and did not have a normal and/or reasonable useful life before sales of class vehicles commenced in the United States.  This information was technical in nature, proprietary and not known by the ordinary consumer or the public, including the proposed class representatives and proposed class members.  The proposed class representatives and proposed class members were ignorant of this technical information through no fault of their own.

71. The defendants acted to conceal the chain assembly defects during the warranty period so that repair costs would be shifted to the proposed class representatives and proposed class members once the warranty expired and the primary and secondary chain assemblies failed.

72. Although the defendants knew the timing chain defects in class vehicles caused premature failure of the chain assemblies, the defendants knowingly and actively concealed material information from prospective purchasers and actual purchasers with the intent to deceive purchasers and promote class vehicle sales.

73. The defendants' knowledge of class vehicle timing chain defects was derived from warranty claims, field investigations, claims supervisors, customer complaints and monitoring of performance of class vehicles by BMW LLC quality assurance employees.  Additionally, the number of replacement components and subsequent component revisions would have placed the defendants on notice of class vehicle defects.  Knowledge of class vehicle defects is further imputed to the defendants prior to sale of certain model year class vehicles because predecessor models using identical chain assembly components were also prematurely failing within their reasonably expected life.  The defendants elected to place into the stream of commerce class vehicles that they knew would be adversely affected by the failure to adequately design and manufacture the chain assemblies.

74. Additional information supporting allegations of fraud and fraudulent conduct is in the control of the defendants. This information includes but is not limited to technical root cause analyses, communications with class vehicle owners, remedial measures, warranty claims and internal corporate communications concerning how to deal with consumers who claim their class enginesø chain assemblies were defective.

75. Material information fraudulently concealed and/or actively suppressed by the defendants includes but is not limited to class vehicle defects described in the preceding paragraphs.

76. Material information was fraudulently concealed and/or actively suppressed in order to sell class vehicles to uninformed consumers (including the proposed class representatives and proposed class members) premised on affirmations and representations of reliable, high quality, long-life vehicles with low maintenance, inexpensive operating costs, superior performance and durability. In fact, class vehicles actually contained a known chain assembly defects that would severely affect the useful life of the vehicle.

77. The defendants (and particularly the sales and marketing executives at BMW LLC) advertised and otherwise created the reasonable expectation (including but not limited to scheduled class engine maintenance recommendations) that class vehicles would last over 150,000 miles or ten years before experiencing chain assembly failure. Material information was fraudulently concealed and/or actively suppressed in order to protect the defendantsø (and authorized vehicle dealersø) corporate profits from loss of sales from adverse publicity, to reduce warranty repair costs and to limit BMWøs brand disparagement.

78. The defendants had a duty to disclose to class vehicle owners that there were materials and manufacture defects in class vehicles and that the ownerøs manuals set forth the wrong maintenance recommendations and maintenance intervals.

79. This duty arose because the defendants knew that there were defects in the vehicles and

inaccuracies in the owner's manuals that affected vehicle operation and safety while class vehicle owners were not, and could not reasonably be, cognizant of these defects and dangers.

80. The defendants continuously and affirmatively concealed the actual characteristics of class vehicles from the proposed class representatives and other purchasers.  The defendants breached their affirmative duty of disclosure to class vehicle owners (and particularly to owners who inquired as to the cause of class vehicle failures).[12]

81. The defendants breached express and implied warranties and actively and affirmatively misrepresented, fraudulently concealed and suppressed, both pre-sale and post-sale, the existence of defects in class vehicles and omissions in accompanying owner's manual and USA Warranty and Maintenance pamphlet.

82. The warranties accompanying class vehicles were procedurally and substantively unconscionable under the Uniform Commercial Code § 2-302 and other applicable state warranty laws because of the disparity in bargaining power of the parties, the purchasers' lack of knowledge that class vehicles were defective, the inability of class vehicle purchasers to bargain with the defendants to increase durational warranties, their lack of knowledge, their lack of meaningful alternatives, disparity in sophistication of the parties, unfair terms in the warranty (including but not limited to durational warranties that unfairly favored the defendants particularly where there were class vehicle defects known only to the defendants and the warranty unfairly shifted repair costs to consumers when class vehicles prematurely fail during their reasonably expected life), absence of effective warranty competition and the fact that class vehicles fail with substantially fewer miles of operation than competitive vehicles from other manufacturers or models identical to class vehicles except for an engine with a belt driven valve train rather than the class engine chain driven valve train.

---

[12] Since unexpected engine failure is a serious safety issue, the defendants had an affirmative duty to disclose the vehicle defects together with associated risks.

83. Purchasers of class vehicles reasonably expect vehicles to function well in excess of the class vehicles' durational warranties before requiring extensive expensive repairs.  This is particularly true where the purchasers of class vehicles were led to believe by the defendants' representations and typical consumer expectations in a commercial context that the useful expected life of the vehicles was in excess of 150,000 miles and there was no scheduled inspection or maintenance for the chain assemblies within this period.

84. Given the conduct of the defendants and the design, manufacture, materials and workmanship defects in class vehicles (that the defendants knew were inherently defective prior to the time of sale as well as post-sale), the durational limitations of the warranties are oppressive, unreasonable and unconscionable because the warranty disclaimers of the proposed class representatives and proposed class members were neither knowing nor voluntary.

85. The proposed class representatives and proposed class members had an absence of any meaningful choice in the purchase of class vehicles and the contractual terms were unreasonably favorable to the defendants since the defendants were fully aware of defects in the class vehicles that substantially reduced the expected useful life of the vehicle. The proposed class representatives and proposed class members were unaware of defects in the class vehicles at the time of purchase.

86. The bargaining position of the defendants for the sale of class vehicles was grossly disproportionate and vastly superior to that of individual vehicle purchasers, including the proposed class representatives and proposed class members.  This is because the defendants knew there were defects in class vehicles affecting the durational operation and operating costs.

87. The defendants included unfair contractual provisions concerning the length and coverage of the express warranty when they knew that class vehicles were inherently defective and dangerous and had been inadequately tested.

31

88. The defendants knew defects in class vehicle components would cause certain expensive repair failures within one-half of the useful expected life of the vehicle. The defendants artificially limited the duration of the warranty period to avoid performing warranty repairs in order to maximize profits through the sale of defective vehicles.

89. The defendants unconscionably sold defective class vehicles to the proposed class representatives and proposed class members without informing these purchasers that the class vehicles were defective. In the alternative, the defendants failed to notify the proposed class representatives and proposed class members after the time of sale that the primary and secondary chain assemblies had been redesigned and that the assemblies in their respective vehicles should be replaced prior to the expiration of the warranty.

90. The defendantsø conduct renders the vehicle purchase contract so one-sided as to be unconscionable under the circumstances existing at the formation of the vehicle purchase contract.

91. The durational limitation of the express warranties accompanying the class vehicles is unreasonable and unconscionable since the defendants actively concealed known vehicle defects and issued incorrect maintenance recommendations and maintenance intervals. The proposed class representatives and proposed class members had no notice of or ability to detect the defects.

92. The defendants restricted the limited power train warranty (including the class engine) duration to 4 years or 50,000 miles (whichever occurs first) for class vehicles in an effort to avoid the cost of repairs because they were cognizant of class vehicle defects that existed at the time of sale.

93. Engines in competitive vehicles manufactured and sold at the time the class vehicles were manufactured and sold ordinarily last longer than warranted by the limited power train warranty accompanying class vehicles.

94. The defendants engaged in unconscionable fraudulent commercial practices and attempted to conceal class vehicle materials defects, workmanship defects, manufacturing defects, design defects and improperly recommended maintenance.

95. The defendants are engaged in a continuing fraud concerning the true underlying cause of class vehicle failures.

96. The defendants failed to adequately test class vehicles in appropriate consumer environments prior to marketing, distribution and sale.

97. The defendants' unconscionable conduct precludes any exclusion of incidental and consequential damages or any other limitation of remedies. The defendants' upper level management orchestrated this wrongful conduct.

98. The proposed class representatives and proposed class members operated and maintained their class vehicles in conformity with the respective owner's manuals and provided the requisite notice to the defendants' authorized agents for warranty repair after their class vehicles failed.

99. Even if class vehicles do not fail entirely, class vehicle owners have sustained an ascertainable financial loss, including but not limited to increased maintenance costs for primary and secondary chain assemblies inspections and/or premature replacement of the primary and secondary chain assemblies and/or substantially reduced engine performance. Individuals who own or have owned class vehicles also sustained diminution of the resale value of their class vehicles since knowledge of problems with class vehicles became public information after the time of their purchase.

100. The proposed class representatives and proposed class members have not received the benefit of their bargain concerning their respective purchase of class vehicles.

101. The defendants are persons within the context of the consumer protection laws of New Jersey together with all other states and committed wrongful conduct described in this complaint

33

including conduct that caused ascertainable financial harm and/or economic loss to the proposed class representatives and proposed class members.

102. The defendants created an over-all misleading impression through their failure to disclose material information concerning the fact that class vehicles incorporated defective chain assemblies and were accompanied an owner's manual and Service and Warranty Information materials pamphlet that incorporated incorrect engine service and maintenance recommendations. The proposed class representatives and proposed class members were deceived by the defendants' conduct as described in this complaint with respect to their purchase of class vehicles.

103. The defendants violated the consumer protection laws of New Jersey together with all other states with their oppressive and unconscionable conduct described in this complaint including but not limited to their failure to disclose material information that caused ascertainable financial harm to proposed class members and proposed class members.

104. The defendants were under a duty to disclose safety defects to class vehicles as described in this complaint but failed to disclose to proposed class representatives and proposed class members the characteristics of class vehicles with respect to defects in violation of the consumer protection laws of New Jersey together with all other states. The defendants' omissions (that class engines were defective and that this defect constituted a safety hazard) deceived purchasers (including but not limited to proposed class representatives and proposed class members). Those disclosure omissions include the fact that class vehicle defects had a significant impact on the value, durability and future care of class vehicles. This failure to disclose additional information concerning class vehicle defects had the capacity to, and in fact did, deceive purchasers (including but not limited to proposed class representatives and proposed class members) in a material respect.

105. If proposed class representatives and proposed class members had been made aware of the defects in their respective class vehicles and the attendant ramifications of value, durability,

maintenance expenses, safety and care, they would not have purchased the class vehicles or would have paid less for their vehicles since class members were led to believe that they were purchasing a vehicle that was free of major defects and were not fully informed of the true characteristics and attributes of class vehicles.

106. The defendants fraudulently, intentionally, negligently and/or recklessly concealed from proposed class representatives and proposed class members defects in class vehicles even though the defendants knew or should have known information concerning these defects was material and central to the marketing and sale of class vehicles to prospective purchasers including proposed class representatives and proposed class members.

107. The defendants violated the consumer protection laws of New Jersey together with all other states by failing to inform class vehicles owners at the time of purchase that class vehicles had known defects, that the vehicles would prematurely require major engine repairs and/or prematurely fail with resulting catastrophic failure and /or would have a significant effect on the vehicle's value.

108. As a direct result of these omissions, proposed class representatives and proposed class members purchased class vehicles and sustained economic harm since they purchased vehicles worth considerably less than represented.  These misrepresentations diminish the value and cost of vehicle ownership while also increasing risk of injury that was not disclosed to or reasonably anticipated by consumers at the time of purchase.

109. The wrongful conduct of the defendants in violation of the consumer protection laws of New Jersey together with all other states occurred within the limitations period set out in the respective statutes and/or the limitations period is tolled by the defendants' conduct.

**What the Omissions Were:**

110. The defendants fraudulently omitted to disclose material facts basic to both the purchase and warranty service concerning class vehicles, including information concerning class engine chain

assemblies defects, in an effort to deceive purchasers as described in ¶¶3-9 and 28-39 of this complaint. At the time of purchase, the defendants fraudulently omitted to disclose material matter regarding the defects in class vehicles, including their impact on future repairs, costs and vehicle reliability. The defendants fraudulently concealed from the proposed representatives and proposed class members defects in class vehicles even though the defendants knew or should have known that information concerning these defects was material and central to the marketing and sale of class vehicles to prospective purchasers, including proposed class representatives and proposed class members.

111. The primary chain plastic guide assemblies in class engines are defective and prematurely fail. The primary chain plastic guide assemblies become brittle and break apart because the guide assemblies are made of defective polycarbonate composition and other materials. Pieces of broken off plastic from the chain guide become lodged in the crankshaft drive sprockets causing chain breakage or chain skip sufficient to cause severe engine damage or complete engine destruction. These scenarios pose a serious safety issue while the vehicle is being operated since there is loss of engine power without warning, loss of power-assisted steering and reduced braking caused by lack of engine vacuum. In class vehicles equipped with manual transmissions, the drive wheels will lock and cause loss of directional stability and steering. In other instances, the engine may fail to start, leaving the driver and passenger stranded mid-journey.

112. The secondary chain (counterbalance shaft and oil pump drive chain) in class engines connects the oil pump and balance shaft assemblies to the crankshaft. The secondary chain assembly is also defective and prematurely fails. Secondary chain failure is caused by materials and design that are required to be high-wear resistant but instead are made of insufficient materials which fail to prevent high resistance wear, resulting in premature elongation and slippage of the chain materials,, and corresponding sprocket damage. This secondary chain was initially redesigned in approximately

36

late 2014 and now incorporates a new solid center link plate.  The secondary chain link plate configurations are depicted in Figure 4, *infra*.  The secondary chain has been redesigned twice and has been assigned part numbers 11417605366, 11417602646 and 11418651102.

113. The defendants concealed from proposed representatives and proposed class members during their warranty periods that a defect existed with the chain assemblies which could have and should have been fixed during the warranty period, particularly as it was a safety issue, and defendantsø withholding of this material information deprived proposed representatives and proposed class members of the right to have such defective part replaced for free under the warranty.

**The Person(s) Responsible for the Failure to Disclose:**

114. The proposed class representatives and proposed class members are entitled to the reasonable inference that the defendantsø sales, marketing, engineering and warranty departments and their executives were involved in the omissions.

**The Context of the Omissions and the Manner in which they Misled:**

115. Material information was fraudulently concealed and/or actively suppressed in order to sell class vehicles to uninformed consumers (including proposed class representatives and proposed class members) premised on affirmations and representations as described in this complaint.

116. If proposed class representatives and proposed class members had been informed of defects in their class vehicles, they would not have purchased their respective class vehicles or would have paid substantially less.  If proposed class representatives and proposed class members had been made aware of the defects in their respective class vehicles and the attendant ramifications of their respective vehicleøs diminution in value, future cost of repairs, durability and care, they would not have purchased the class vehicles since each class member believed they were purchasing vehicles without major defects and were not fully informed of true characteristics and attributes of class vehicles.  If the proposed class representatives and proposed class members had been informed of the

defect during the warranty period, they would have had the defective part replaced under warranty. The defendantsø conduct that violated the consumer fraud statutes alleged herein deprived proposed representatives and proposed class members of that remedy.

**What the Defendants Obtained through the Fraud:**

117. Material information concerning class vehicles was concealed and/or actively suppressed in order to protect the defendantsø corporate profits from loss of sales, purchase refunds, warranty repairs, adverse publicity and limit brand disparagement. Purchasers believed they were obtaining vehicles as having different attributes than described and purchased and were accordingly deprived of economic value and paid a price premium for their class vehicles. The defendants had a uniform policy of not properly disclosing class vehicle defects in order to promote sales and increase profits as described in this complaint.

118. As a proximate and direct result of the defendantsø unfair and deceptive business trade practices, proposed class representatives and proposed class members purchased class vehicles and sustained an ascertainable loss, including but not limited to financial harm as described in this complaint.

**COUNT I**
**BREACH OF UNIFORM COMMERCIAL CODE § 2-313: EXPRESS WARRANTY OF MERCHANTABILITY BY THE DEFENDANTS RESULTING IN FINANCIAL HARM**
**(On Behalf of the Nationwide Class or, Alternatively, the New Jersey and Illinois Subclass)**

119. The proposed class representatives and proposed class members incorporate by reference all allegations in the above preceding paragraphs as if set forth fully in this count.

120. The defendants are merchants with respect to passenger motor vehicles. Class vehicles are goods within the meaning of the Uniform Commercial Code as adopted by New Jersey and Illinois.

121. The proposed class representatives and proposed class members have established sufficient direct dealings, including but not limited to vehicle purchase, with the defendants or their agents (dealerships and technical support) to establish privity of contract with the defendants.

122. The defendants provided class members an express powertrain limited warranty of "4 years or 50,000 miles whichever occurs first, from date the vehicle was first placed in service." Specifically covered by this powertrain-limited warranty were "all internal [engine] parts" including the engine chain assemblies. This warranty promised to repair or replace covered defective class engine components arising out of defects in materials and/or workmanship for a period of 4 years or 50,000 miles, whichever occurs first for non-commercial purchasers.

123. The defendants expressly warranted to the general public, owners and lessees of class vehicles that class vehicles were merchantable and fit for the ordinary purposes for which passenger vehicles are used. The defendants are merchants with respect to passenger motor vehicles. The proposed class representatives and proposed class members purchased their respective vehicles for personal, family, and/or household use and did not engage in commercial use of their vehicles.

124. The defendants extensively advertised that class vehicles were superior in construction and extolled the quality and virtues of these vehicles including superior design and manufacture, safety, durability, reliability and performance when in fact class vehicle engines contained known defects in the primary and secondary chain assemblies as described in ¶¶3-9 and 28-39 of this complaint that severely reduced the useful life of the vehicle.

125. The defendants represented that class vehicles were of a particular standard or quality, as described in this complaint, when they in fact were not. Timing chain assemblies in class engines are failing far short of the expected useful life.

126. The proposed class representatives and proposed class members were not presented with an opportunity to review (let alone bargain for) the warranty provisions at the time of purchase of their

class vehicles and were unaware of the defects in the primary and secondary chain assemblies of class vehicle engines that made the respective bargaining position of the parties unequal at the time of vehicle purchase.

127. The defendants' representations (including representations made by employees of authorized retail dealers relying on specification and sales materials generated by the defendants) were made in newspapers, magazines, engine and Internet advertising together with sales literature viewed by the proposed class representatives and proposed class members.

128. The defendants received adequate notice of their breach of their express warranties and failed to cure the warranty breaches.  The proposed class representatives and class members reported to the defendants the problems with and failings of the primary and secondary chains in their vehicles and requested of defendants that they cure and/or repair and/or replace the defective chain components.  In the alternative, the proposed class representatives, as indirect purchasers, were not required to issue notice of the warranty breach to the defendants and the lack of notice of warranty breach did not result in any prejudice to the defendants.

129. The proposed class representatives and proposed class members complied with maintenance recommendations for their respective class vehicle.

130. The defendants failed to remedy by replacement or repair the proposed class representatives' chain assemblies that were defective in materials and workmanship during the express warranty period although these defects were known to the defendants at that time.[13]  Class vehicles owned by the proposed class representatives and proposed class members also prematurely failed

---

[13] The Service and Warranty Information materials for class vehicles recites as follows:

To obtain warranty service coverage, the vehicle must be brought, upon discovery of a defect in material or workmanship, to the workshop of any authorized BMW SAV center in the United States or Puerto Rico, during normal business hours.  The authorized BMW SAV center will, without charge for parts or labor, either repair or replace the defective part(s) using new or authorized remanufactured parts.

and/or experienced substantial performance diminution within the express warranty period of 4 years or 50,000 miles.

131. The proposed class representatives and proposed class members relied on the express warranties made by the defendants regarding the class vehicles on choosing to purchase their BMW vehicles.  As a result, they sustained an ascertainable loss in the purchase price of their vehicles and other financial injury, including the cost for the chain assembly repairs, resulting from the breach of those warranties by the defendants.

132. Because of the chain assembly defects, class vehicles are not reliable and owners of these vehicles have lost confidence in the ability of class vehicles to perform the function of safe reliable transportation.

133. The proposed class representatives and proposed class members could not have reasonably discovered the defective condition of their class vehicle engines prior to failure.

134. The express warranty remedy set out in the warranty provisions of class vehicles fails of its essential purpose under Uniform Commercial Code § 2-719(2) and the limitation of consequential damages is unconscionable under § 2-719(3) because of the conduct of the defendants described, *supra*.

135. The defendants breached their express warranties in that class vehicles were defective with respect to engine materials, workmanship, design and manufacture.  The defendants further breached their express warranties in that the class vehicles were accompanied by an owner's manual and Service and Warranty Information materials that incorporated no inspection and service intervals for the primary and secondary chain assemblies although the defendants knew these components were defective and required periodic inspection and service.

136. The defendants further breached their express warranties by failing to remedy the chain assembly defects caused by defects in materials and workmanship as required by the warranty that

accompanied the respective class vehicles.  Class vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of engine materials, workmanship, design and manufacture defects which cause engine failure and failure to perform as warranted.

137.  The proposed class representatives and proposed class members relied on express warranties made by the defendants concerning the class vehicles and sustained financial injury resulting from the breach of those warranties by the defendants.

138. The proposed class representatives and proposed class members could not have reasonably discovered the defective condition of the class vehicles.  The defendantsø breach of their express warranties was the direct and proximate cause of the proposed membersø financial harm.

139. Wherefore, proposed class representatives and proposed class members demand judgment against defendants for multiple damages, interest, costs and attorneysø fees.

## COUNT II
## BREACH OF UNIFORM COMMERCIAL CODE § 2-314: IMPLIED WARRANTY OF MERCHANTABILITY BY THE DEFENDANTS
### (On Behalf of the Nationwide Class or, Alternatively, the New Jersey and Illinois Subclass)

140.  The proposed class representatives and proposed class members incorporate by reference all allegations in the above preceding paragraphs as if set forth fully in this count.

141. The defendants are merchants with respect to passenger motor vehicles.  Class vehicles are goods within the meaning of the Uniform Commercial Code as adopted by New Jersey and Illinois.

142. The defendants failed to provide legally binding written notice to proposed class representatives and other class vehicle purchasers of implied warranty exclusions at time of purchase because the warranty exclusion failed to mention merchantability and was not conspicuous within the meaning of § 2-316 and therefore ineffective by law.

143. The defendants impliedly warranted to the general public, owners and lessees of class vehicles that the class vehicles were merchantable and fit for the ordinary purposes for which passenger vehicles are used.  The proposed class representatives and proposed class members purchased their respective vehicles for personal, family, and/or household use and did not engage in commercial use of their vehicles.

144. As manufacturers of consumer goods, the defendants are precluded from excluding or modifying an implied warranty of merchantability or limiting consumer remedies for breach of this warranty.

145. To the extent privity of contract is required for purposes of the application of implied warranty, the proposed class representatives and proposed class members are third-party beneficiaries to a contract implemented by the defendants that creates an implied warranty of merchantability.

146. The defendants breached their implied warranties in that class vehicles were defective with respect to engine design and manufacture as described in this complaint and were unfit for the ordinary purposes for which passenger vehicles are used because of those defects which caused premature primary and secondary chain assemblies failure and consequent damage to the engine.

147. Class vehicles are predisposed to premature failure in normal anticipated operating environments because of engine materials, workmanship, design and manufacture defects described in this complaint that existed at the time these vehicles were manufactured.

148. Class vehicles are not reliable and owners of these vehicles have lost confidence in the ability of class vehicles to perform the function of safe reliable transportation without the likelihood of unanticipated sudden catastrophic engine failure.  The defendants are estopped by their conduct, as described in this complaint, from disclaiming any and all implied warranties with respect to the chain assemblies in class engines.

149. The proposed class representatives and proposed class members relied on implied warranties of merchantability made by the defendants regarding the class vehicles in choosing to purchase their respective class vehicles and sustained an ascertainable financial injury resulting from the breach of those warranties by the defendants.

150. The defendants received adequate notice of their breach of the implied warranty of merchantability through proposed class representatives and proposed class membersø requests for repair or replacement.  In the alternative, class vehicle owners, as indirect purchasers, were not required to issue notice of the warranty breach to the defendants and any lack of notice of warranty breach did not result in any prejudice to the defendants.  The defendants declined to offer the proposed class representatives an effective remedy for their defective class engine or vehicle.

151. Even though the proposed class representatives and proposed class members complied with class vehicle engine maintenance recommendations for their respective class vehicles, their respective class vehicle engines prematurely failed because of defects in the primary and secondary chain assemblies.

152. The proposed class representatives and proposed class members reasonably relied upon the expertise, skill, judgment and knowledge of the defendants and upon their implied warranty that class vehicles were of merchantable quality and fit for their intended use.  Class vehicles did not conform to the defendantsø implied representations or warranties because of defects in the chain assemblies were less reliable and more expensive to maintain than previous or current model BMWs or competitor vehicles.

153. The proposed class representatives and proposed class members had an independent legitimate consumer expectation that the class vehicles would last well in excess of 10 years and 150,000 miles before requiring any major engine repairs based on industry standards, the defendantøs publications and other publications, competitor products, consumer product magazines, prior vehicle

ownership and reputation of the defendants for manufacturing durable quality vehicles. There were no statements made by the defendants or their agents that contradicted or led consumers to lower their legitimate expectations at the time of purchase.

154. The proposed class representatives and proposed class members could not have reasonably discovered the defective condition of the class vehicles because the class engine defects were inside of the engine.  The defendants' breach of their implied warranties of merchantability was the direct and proximate cause of proposed class representatives' and proposed class members' financial harm. Had the class vehicles not contained defective and failing chain assemblies, proposed class representatives and proposed class members would not have incurred the costs of engine repair.

155. Wherefore, the proposed class representatives and proposed class members demand judgment against defendants including multiple damages, interest, costs and attorneys' fees.

**COUNT III**
**VIOLATION OF MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2310(d)(1(A)**
**(On Behalf of each of the State Subclasses Class or,**
**Alternatively, the New Jersey and Illinois Subclass)**

156. The proposed class representatives and proposed class members incorporate by reference all allegations in the above preceding paragraphs as if set forth fully in this count.

157. This claim is brought as a state law claim under 15 U.S.C. §2310(d)(1)(A) and is before this Court as a supplemental State Court claim for each of the state subclasses pursuant to diversity jurisdiction under CAFA.

158. The proposed class representatives and proposed class members are consumers within the context of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

159. Class vehicles are consumer products within the context of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

160. The defendants are suppliers and/or warrantors within the context of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

161. The defendantsø express warranties are written warranties within the context of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  Class vehicle implied warranties created by operation of state law are incorporated into the Magnuson-Moss Warranty Act as modified by § 2308.

162. The defendants breached the express and implied warranties accompanying class vehicles as described in this complaint.

163. The Magnuson-Moss Warranty Act, provides a claim for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

164. The defendantsø breach of their express and implied warranties was the direct and proximate cause of the proposed class representatives and proposed class membersø financial harm as more fully set out in the preceding warranty counts, and constitutes a violation of the Magnuson-Moss Warranty Act.

165. The proposed class representatives and proposed class members have alleged in this complaint sufficient direct dealings with the defendants or their agents (dealerships and technical support) to establish privity of contract with the defendants.  In the alternative, privity of contract is not required because proposed class representatives and proposed class members are intended third-party beneficiaries of contracts between the defendants and its dealers, specifically including implied warranties.  Authorized class vehicle dealers were not intended to be the ultimate consumers of class vehicles and have no rights under the warranty provisions accompanying class vehicles since these provisions were drafted and intended to benefit the consumer purchasers of class vehicles.

166. Affording the defendants a reasonable opportunity to cure their breach of written warranties for class vehicles would be unnecessary and futile.  The proposed class representatives and proposed class members have already attempted to secure coverage for their primary and secondary chain assemblies

and related repairs without success.

167.  At the time of sale or lease of each class vehicle, the defendants knew, should have known, or were reckless in not knowing of their misrepresentations and omissions concerning the class vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defects as described in this complaint.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that class vehicles resort to an informal dispute resolution procedure and/or afford the defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

168. The proposed class representatives and proposed class members would suffer economic hardship if they returned their class vehicles but did not receive the return of all payments made by them.

169. Wherefore, proposed class representatives and proposed class members demand judgment against the defendants including multiple monetary damages, interest, costs and attorney's fees.

## COUNT IV
## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT ("NJCFA")
## N.J. STAT. ANN. § 56:8-2 *ET SEQ.*[14]
## (On Behalf of Plaintiff Patel and the New Jersey Subclass)

170. Proposed class representative Patel incorporates by reference all allegations in the above preceding paragraphs as if set forth fully in this count.

171. Proposed class representative Patel asserts this count on behalf of himself and proposed New Jersey subclass members.

172. The NJCFA prohibits "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such

---

[14] Counsel for the plaintiffs will serve the New Jersey Attorney General with a copy of this complaint in accordance with N.J. STAT. ANN. § 56:8-20.

concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . ö N.J. STAT. ANN. § 56:8-2.

173. Proposed class representative Patel and members of the New Jersey subclass are consumers/persons who purchased or leased class vehicles for personal, family, or household use. The defendants are persons engaged in trade or commerce with respect to merchandise within the context of NJCFA.

174. In violation of the NJCFA, defendants employed unconscionable commercial practices, deception, fraud, false pretense and/or false promise by providing class vehicles that contain class engine defects described in this complaint and present an undisclosed safety risk to drivers and occupants of the class vehicles. Further, defendants misrepresented the standard, quality or grade of the class vehicles that were sold or leased with the latent known defects and/or failed to disclose class engine defects described in this complaint and corresponding safety risk in violation of the NJCFA. The defendants fraudulently, intentionally, negligently, and/or recklessly misrepresented to proposed class representative Patel and proposed New Jersey subclass members the required maintenance and/or maintenance intervals of class vehicle engines, including but not limited to the primary and secondary chain assemblies.

175. Defendantsø misrepresentations and fraudulent omissions were material to plaintiff Patel and members of the New Jersey subclass. When Patel and members of the New Jersey subclass purchased or leased their class vehicles, they reasonably relied on the expectation that the class vehiclesø primary and secondary chain assemblies would last beyond the warranty periods without need for repair or replacement and would not pose an unavoidable safety risk. Had defendants

disclosed that the primary and secondary chain assemblies were prone to premature failure and/or an unavoidable safety risk, Patel and members of the New Jersey subclass would not have purchased or leased the class vehicles, or would have paid less for their vehicles.  Further, had defendants disclosed that the class engine primary and secondary chain assemblies would not last beyond the warranty periods without need for repair or replacement, Patel and members of the New Jersey subclass would have demanded repair or replacement during the warranty periods at no cost to Patel and members of the New Jersey subclass as provided for in defendants' warranties.

176. Defendants knowingly concealed, suppressed and/or omitted to disclose the existence of the class engine primary and secondary chain assembly defects and safety risk in the class vehicles at the time of sale or lease and at all relevant times thereafter. The defendants also fraudulently, intentionally, negligently and/or recklessly misrepresented to proposed class representative Patel and proposed New Jersey subclass members the characteristics of class vehicle engines with respect to material, manufacture, durability, design, longevity, maintenance and operating costs.  The defendants extensively advertised that class vehicles were superior in construction and extolled the quality and virtues of class vehicles, including superior materials, workmanship, design, manufacture, safety, durability, reliability and performance, and also included an engine life exceeding 150,000 miles.  In fact, class engines contained a known defect as described in this complaint that caused class engines to prematurely fail.

177. Defendants knew that the class engine defects described in this complaint would cause the chain assemblies to fail before the useful life of the engine and unconscionably limited the manufacturer's warranty coverage so that the primary and secondary chain assembly would fail beyond the warranty periods, thereby unlawfully transferring the costs of repair of these components to proposed class representative Patel and members of the New Jersey subclass. Further, defendants

unconscionably marketed the class vehicles to uninformed consumers in order to maximize profits by selling additional class vehicles containing the undisclosed latent defect and corresponding safety risk.

178. Defendants owed a duty to disclose the class engine defects described in this complaint and its corresponding safety risk to Patel and members of the New Jersey subclass because defendants possessed superior and exclusive knowledge regarding the defect and the risks associated with primary and secondary chain assembly failure.   Rather than disclose the defects, defendants intentionally concealed the defect with the intent to mislead Patel and members of the New Jersey subclass in order to sell additional class vehicles and wrongfully transfer the cost of repair or replacement of the defective components or failed engine to Patel and members of the New Jersey subclass. The defendants actively suppressed the fact that class engines were prematurely failing because of materials, workmanship, design and manufacture defects, as well as incorrect maintenance recommendations and maintenance intervals.

179. Defendants knew, or should have known, that the primary and secondary chain assembly defects in class vehicles would cause catastrophic engine failure leading to a loss of engine power while the vehicle was operating.  Further, defendants knew, or should have known, that such loss of power would cause class vehicles to become involved in rear-end collisions or other accidents, putting vehicle operators, passengers, and other motorists at risk for injury.   The defendants actively suppressed the fact that class engines were prematurely failing because of materials, workmanship, design and manufacture defects, as well as incorrect maintenance recommendations and maintenance intervals.  Although the defendants knew defects in class engines and misinformation in the owner's manuals were causing premature class engine failures, the defendants denied any liability and attempted to shift the responsibility and cost for repairs to individual vehicle owners.  In certain instances, the defendants secretly repaired some class engine to prevent dissemination of knowledge concerning class engine defects.

50

180. Had Patel and members of the New Jersey subclass known about the class engine defects described in this complaint at the time of purchase, including the safety hazard posed by the defect and the monetary cost of repair, they would not have bought the class vehicles or would have paid much less for them.

181. As a direct and proximate result of defendants' wrongful conduct in violation of the NJCFA, Patel and members of the New Jersey subclass have suffered and continue to suffer harm by the threat of sudden and unexpected failure of the primary and secondary chain assemblies and/or actual damages in the amount of the cost to replace the defective assemblies including other essential engine parts and/or the entire engine. Plaintiff Patel and members of the New Jersey subclass have also suffered the ascertainable loss of the diminished value of their vehicles. In the case of proposed class representative Patel, he incurred financial damages of $7,952.09 (exclusive of vehicle towing) to replace the engine in his class vehicle when the engine chain assemblies failed. The engine failure was directly and proximately caused by the defendants' violation of the NJCFA.

182. As a further result of defendants' fraudulent and/or deceptive conduct, misrepresentations and/or knowing omissions, proposed class representative Patel and members of the New Jersey subclass are entitled to actual damages, treble damages, costs, attorneys' fees, and other damages to be determined at trial as allowed by N.J. STAT. ANN. § 56:8-19. Plaintiff Patel and members of the New Jersey subclass also seek an order enjoining defendants' unlawful, fraudulent and/or deceptive practices, and any other just and proper declaratory or equitable relief available under the NJCFA. *See* N.J. STAT. ANN. § 56:8-19.

183. Rather than conduct an open and fair inspection and repair procedure for all class engines, the defendants employed unfair and deceptive trade act practices to deny repairs or repair reimbursements in violation of the NJCFA. One scheme included blaming class engine failures on

owners for poor or improper maintenance and other conditions for which the defendants were not allegedly responsible.

184. The defendants' deceptive trade practices were likely to deceive a consumer acting reasonably under the circumstances which proposed class representative Patel and proposed New Jersey subclass members were caused to suffer ascertainable damages by expending sums of money in purchasing and later repairing their class vehicles. As reasonable consumers, proposed class representative Patel and proposed New Jersey subclass members had no reasonable way to know that class vehicles contained chain assemblies which were defective in materials, workmanship, design and manufacture. Any reasonable consumer under the circumstances would have relied on the representations of the defendants who alone possessed the knowledge as to the quality and characteristics of the class vehicles, including the engine and chain assembly durability.

185. If the defendants had not concealed class engine defects from proposed class representative Patel and proposed New Jersey subclass members within the express warranty period, class engines would have been repaired without cost to purchasers as promised under the original warranty.

186. The defendants fraudulently concealed unmistakable manifestations of impending class engine failures within the express warranty period without inspecting, repairing or replacing damaged internal class engine components.

187. The defendants violated the NJCFA by failing to inform class vehicle owners prior to purchase and/or during the warranty period that class engines were defective in materials, workmanship, design and manufacture and were accompanied by incorrect maintenance recommendations and maintenance intervals.

188. The defendants violated the NJCFA by failing to inform class vehicle owners prior to purchase and/or during the warranty period that class engines contained defects and would require

regular replacement of expensive internal engine components such as the primary and secondary chain assemblies.

189. The defendants further violated the NJCFA by failing to inform prospective class vehicle purchasers that the defendants had not properly tested the engines including but not limited to the chain assemblies.

190. The defendants committed unfair and deceptive business trade act practices as described in this complaint. The defendants repeatedly violated the NJCFA on multiple occasions with their continuous course of conduct including omissions of material fact and misrepresentations concerning *inter alia,* the causes of the failures of class engines owned by Patel and proposed subclass members.

191. The secret warranty programs for class engines initiated by the defendants and other wrongful conduct of the defendants in violation of NJCFA occurred within the limitations period set out in the statute and/or is tolled by the defendants' conduct.

192. As a proximate and direct result of the defendants' unfair and deceptive business trade practices, proposed class representative Patel and proposed New Jersey subclass members purchased class vehicles and sustained an ascertainable loss and financial harm.

193. The proposed class representative Patel and proposed New Jersey subclass members experienced premature class engine failure, diminution of class vehicle resale value, increased repair and maintenance costs and incurred other substantial monetary damages and inconvenience.

194. The conduct of the defendants offends public policy as established by statutes and common law; is unethical, oppressive and/or unscrupulous and caused unavoidable substantial injury to class vehicle owners (who were unable to have reasonably avoided the injury due to no fault of their own) without any countervailing benefits to consumers and therefore constitutes an unconscionable commercial practice.

195.  Wherefore, proposed class representative Patel and proposed New Jersey subclass members demand judgment against the defendants for restitution, disgorgement, statutory and actual monetary damages, interest, costs, attorneys' fees and injunctive relief including a declaratory judgment and an appropriate Court order prohibiting the defendants from further deceptive acts and practices described in this complaint.

### COUNT V
### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND
### DECEPTIVE BUSINESS PRACTICES ACT
### 815 ILCS 505/1 *ET SEQ.*
### (On Behalf of Plaintiff Gelis and the Illinois Subclass)

196. Plaintiff Gelis incorporates by reference all allegations in the above preceding paragraphs as if set forth fully in this count.

197. Plaintiff Gelis asserts this count on behalf of himself and members of the Illinois sub-class.

198. Defendants' practices, acts, policies and course of conduct, as described above, constitute unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentations, and/or the knowing concealment, suppression, or omission of material facts with the intent that consumers, including plaintiff Gelis and members of the Illinois sub-class, rely upon such concealment, suppression, omission in connection with the sale or advertisement of merchandise of class vehicles in violation of the Illinois Consumer Fraud and Deceptive Business Practice Act (ICFA), 815 ILCS 505/1 *et seq.* (the "Consumer Fraud Act"), when purchasing and/or leasing their respective class vehicles with the defective primary and secondary chain assemblies.

199. Defendants intentionally concealed, suppressed and omitted to plaintiffs Gelis and members of the Illinois sub-class at the time of purchase or lease, that the class vehicles contained manufacturing, materials and/or workmanship defects, with the intent that plaintiffs Gelis and

54

members of the Illinois sub-class rely upon such concealment, suppression, failure to disclose or omission.

200. Defendants knew and intentionally concealed, suppressed and omitted to consumers who purchased or leased the class vehicles, including plaintiffs Gelis and members of the Illinois sub-class, the existence of defects and problems in the primary and secondary chain assemblies, despite the fact that defendants possessed prior knowledge of the inherent defects to the class vehicles' primary and secondary chain assemblies.

201. Defendants actively concealed from plaintiff Gelis and members of the Illinois sub-class the fact that the primary and secondary chain assemblies were defective, despite the fact that defendants learned of such defects in as early as 2012.

202. Defendants represented to plaintiff Gelis and members of the Illinois sub-class that class vehicles were of merchantable quality, in proper working order, and fit for the ordinary purposes for which passenger vehicles are used when in fact the class vehicles were not of merchantable quality, were not in proper working order, and/or were unfit for the ordinary purposes for which passenger vehicles are used because of engine materials, workmanship, design and/or manufacture defects which cause premature primary and secondary chain assemblies failure, engine failure, and/or failed performance.

203. Defendants' acts of commission and omission were done with knowledge and intent to induce plaintiff Gelis and members of the Illinois sub-class to rely upon defendants' deceptive misrepresentations and decide to purchase and/or lease a class vehicle.

204. Defendants' deceptive acts of commission and omission were material and in regard to facts material to a consumer's decision to purchase and/or lease a class vehicle.

205. Defendantsø conduct was in the course of conduct involving trade or commerce in the sale and/or lease of the class vehicles and/or related activities.

206. Defendantsø acts of commission and omission caused plaintiffs Gelis and members of the Illinois sub-class to suffer ascertainable losses of money and property in that they were forced to expend sums of money at its dealerships and elsewhere to repair and/or replace the primary and secondary chain assemblies and/or primary and secondary chain assemblies components of their class vehicles, despite the fact that defendants had prior knowledge of the defects at the time of placing class vehicles into the stream of commerce.

207. In addition to direct monetary losses, plaintiffs Gelis and members of the Illinois sub-class suffered an ascertainable loss by paying for the repair out of pocket and by receiving less value than what was promised to them at the time of purchase and/or lease.  Specifically, plaintiffs Gelis and members of the Illinois sub-class paid for a vehicle that is now worth significantly less because of the existence of the defective primary and secondary chain assemblies, because of the damage it causes to the class vehicles, and because the purchase price of the class vehicles included a warranty program that was supposed to provide free repairs for all defects in materials or workmanship that occurred during the warranty period, but instead were deprived of the value of this warranty due to defendantsø knowing concealment.

208. A causal relationship exists between defendantsø deceptive and unlawful conduct and the ascertainable losses suffered by plaintiffs Gelis and members of the Illinois sub-class.  Consumers, including plaintiff Gelis and members of the Illinois sub-class, relied upon defendantsø misrepresentations, concealments, and omissions in deciding to purchase and/or lease their class vehicles.  Had the defective primary and secondary chain assemblies in the class vehicles been disclosed, they would not have purchased them, would have paid less for the class vehicles had they

decided to purchase them, or taken affirmative steps to prevent the catastrophic damage to their class vehicles' primary and secondary chain assemblies and engine during the warranty period.

**COUNT VI**
**NEGLIGENT MISREPRESENTATION**
**(On Behalf of the Nationwide Class or, Alternatively, the New Jersey and Illinois Subclass)**

209. Proposed class representatives and proposed class members hereby incorporate by reference all allegations in the preceding paragraphs as if set forth fully in this count.

210. The defendants negligently and recklessly misrepresented to proposed class representative and proposed class members the characteristics of class vehicles with respect to engine materials, workmanship, design and manufacture, including that the class engine had a sufficient and adequate engine chain assemblies.  The defendants negligently and recklessly misrepresented information in the class vehicles' owner's manuals that incorporated incorrect maintenance and service recommendations.

211. The proposed class representative and proposed class members reasonably and justifiably relied upon representations made by the defendants including information in the class vehicles' owner's manual that incorporated incorrect engine inspection and service intervals.

212. As a proximate and direct result of proposed class representative and proposed class members' reliance on the defendants' negligent and reckless misrepresentations, proposed class representative and proposed class members sustained monetary damages as described in this complaint.

213. Wherefore, proposed class representative and proposed class members demand judgment against defendants for multiple damages, interest, costs and attorneys' fees.

## COUNT VII
## UNJUST ENRICHMENT
**(On Behalf of the Nationwide Class or, Alternatively, the New Jersey and Illinois Subclass)**

214. The proposed class representative and proposed class members incorporate by reference all allegations in the above preceding paragraphs as if set forth fully in this count.

215. The defendants breached their implied and express warranties in that class vehicles were defective with respect to engine materials, workmanship, design and manufacture. The defendants further breached their express and implied warranties in that class vehicles were accompanied by an owner's manual that incorporated incorrect inspection and service intervals. The class vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of engine materials, workmanship, design and manufacture defects and an owner's manual that incorrectly set forth service intervals.

216. The defendants intentionally, negligently and recklessly and/or fraudulently misrepresented to proposed class representative and proposed class members the characteristics of class vehicles with respect to engine design and manufacture together with information in the class vehicles' owner's manuals that incorporated incorrect engine inspection and service intervals.

217. The defendants benefited financially from their breaches of warranty, misrepresentations and fraud as described in this complaint. The defendants denied legitimate class vehicle engine warranty claims and obtained further unwarranted financial gain.

218. The proposed class representative and proposed class members sustained monetary damages as described in this complaint.

219. Allowing the defendants to retain their monetary enrichment from their wrongful and unlawful acts would be unjust and inequitable.

220. The proposed class representative and proposed class members request that the defendants disgorge their profits from their wrongful and unlawful conduct and that the Court establish a

constructive trust funded by the benefits conferred upon the defendants as a result of their wrongful conduct.  The proposed class representative and proposed class members should designate beneficiaries of the trust and obtain restitution for their out of pocket expenses caused by the defendants' conduct.

221. Wherefore, proposed class representative and proposed class members demand judgment against defendants for multiple damages, interest, costs and attorneys' fees.

## COUNT XIII
## INJUNCTIVE AND DECLARATORY RELIEF

222. The proposed class representative and proposed class members hereby incorporate by reference all allegations in the preceding paragraphs as if set forth fully in this count.

223. There is a justiciable dispute as to whether the primary and secondary chain assemblies incorporated in class engines should be covered under the Limited Powertrain Warranty and/or New Vehicle Limited Warranty accompanying class vehicles.

224. The proposed class representative and proposed class members request a declaratory judgment declaring that, going forward, the remedial work necessary to correct the defective chain assemblies incorporated in class engines together with all resulting damages are covered warranty claims.

225. This remedy is requested for all class members who still possess their vehicles.  This remedy is authorized under the consumer fraud statutes of New Jersey together with all other states that grant each respective proposed class representative and proposed class member the right to seek injunctive or declaratory relief for violations of such consumer fraud statutes.

**RELIEF DEMANDED**

Wherefore, proposed class representative request:

(a) A proposed Order pursuant to Fed. R. Civ. P. 23(c) certifying the class and/or subclass as defined in ¶ 19 with such modifications, if any, to the proposed certification as required by the Court for the efficient and equitable administration of justice in this proceeding;

(b) An Order appointing proposed class representative as representative of the proposed class and designating the law firms of Kantrowitz, Goldhamer & Graifman, P.C. and Thomas P. Sobran P.C. as counsel for the proposed class pursuant to Fed. R. Civ. P. 23(g);

(c) Judgment for proposed class representative and proposed class members against the defendants on all issues and counts;

(d) Damages for proposed class representative and proposed class members, including but not limited to multiple damages, together with interest, prejudgment interest, costs and attorneys' fees;

(e) Restitution for all engine repairs incurred by proposed class representative and proposed class members resulting from the defectively designed and manufactured chain primary and secondary chain assemblies and incorrect maintenance and service intervals as set forth in the class vehicles' owner's manuals;

(f) Restitution of incidental expenses incurred by proposed class representative and proposed class members, including but not limited to rental vehicles and other substitute transportation;

(g) A Court issued declaratory judgment declaring that all class vehicle claims caused by their defective chain assemblies are within the scope of the class vehicles' warranty coverage; and,

(h) Any other relief deemed necessary by the Court.

**REQUEST FOR JURY TRIAL**

The proposed class representative and proposed class members request trial by jury on all issues and counts.

/s/ Gary S. Graifman
Gary S. Graifman, Esq.
Jay I. Brody, Esq.
**KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.**
747 Chestnut Ridge Road
Chestnut Ridge, NY 10977


/s/ Thomas P. Sobran
**THOMAS P. SOBRAN, P.C.**
7 Evergreen Lane
Hingham, MA 02043
(781) 741-6075
(to be admitted *pro hoc vice*)

**Attorneys for Plaintiffs**

Dated: September 22, 2017